Case number 16-5070 et al. Caroline Herron, Appellant v. Fannie Mae et al. Ms. Barnaby for the Appellant, Mr. Johnson for Appellee FHFA, and Ms. Caston for Appellee Fannie Mae et al. May it please the Court, I'm Lynn Barnaby representing Ms. Herron, the Appellant. I reserve two minutes for rebuttal. This case is about a whistleblower, Fannie Mae, who disclosed to Treasury the massive problems in the Administration's signature foreclosure program, resulting in the waste of millions of dollars of taxpayer funds. There are four key errors I wanted to address. First, if this panel decides that Fannie Mae is a private actor, then the errors are as follows. In deciding the wrongful discharge claim, the District Court erred in finding key facts in the Appellee's favor. The Court found that Ms. Herron made no disclosures to Treasury, that her disclosures were not significant, and that it was Treasury, not Fannie Mae, that blocked Ms. Herron's move to Treasury. All those are against the weight of the evidence, and the District Court made findings of fact, of material facts in dispute. Second, based on the District Court's decisions on these disputed facts, it made another erroneous finding, that since Ms. Herron, the Court found, made no disclosures to Treasury, there was no close fit between her reports or criticisms and the clear public policies in the Emergency Economic Stabilization Act. What disclosure did she make, as opposed to, you used the word criticism and the word disclosure. As far as criticism, what is the disclosure you say the judge erroneously did not find? And that that would jeopardize the success of the program, and that that would lead to a waste of public funds. Those were what she said to Treasury, what she said internally, and that's what stopped her. Is that a factual matter that was theretofore undisclosed? Is that a factual matter that was theretofore undisclosed? It was before the District Court. No, no, no, we're back at the time of the commission of the alleged torts here. I'm trying to find out precisely what facts were previously undisclosed if this alleged twist of blue were disclosed. Oh, well, what was undisclosed that she disclosed to Treasury was that the magnitude of the problem of the failure of the trial modifications not to convert. In fact, Fannie Mae, which was primarily responsible, had the most personnel and ran the program for Treasury as a fiduciary to Treasury, was continuously pushing trial modifications based on stated income. What wasn't disclosed to Treasury by the administrator of the program was that these were failing, and they were failing at very high rates. And she said to Treasury, I'm finding from my talks with servicers these are failing at the rate of 50 percent. In fact, the actual rate at which they failed in retrospect was 90 percent. Fannie Mae was telling Treasury this is a good route. Let's get more of these. Let's keep pushing, because they were pushing for numbers for their bonuses, not for trial modifications that would succeed. There's ample evidence outside of Ms. Heron's deposition testimony that the District Court ignored that she made disclosures to Treasury. If you look at the Brownwich Report, that's Joint Appendix 1134, this was Fannie Mae's outside lawyers' investigation into Ms. Heron's allegations. Mr. Schupenhauer told Fannie Mae's outside attorneys and adopted in his deposition the following statement. He acknowledged that during the conversation with Ms. Heron on December 18th, he asked Ms. Heron, quote, not to be mean to Fannie Mae after she moved to Treasury. He acknowledged, and this is a quote, having developing concerns that Ms. Heron had criticized Fannie Mae to Treasury, and he admitted that these concerns about Ms. Heron's criticisms of Fannie Mae may have affected his views about Ms. Heron's proposed transition to Treasury. Ms. Brown, another of Ms. Heron's supervisors who blocked her move, also told Fannie Mae investigators that she was concerned when Ms. Heron told her, quote, Treasury wants to take a more active and high-touch role with servicers. And Mr. Schupenhauer responded to this email by saying he was very concerned about Ms. Heron because I think she trashed us to Treasury. What did she say to Treasury in response to your question, Judge Sentelle? Mr. Schupenhauer also told the Brownwich investigators about Ms. Heron's disclosures. He said Ms. Heron had criticized the trial modification conversion campaign in early December 2009 on the grounds that the campaign would not have been necessary if HAMP had required verified trial modifications from the outset. That's Joint Appendix 1134. So it's clear from the record, in fact, from the mouths of the individual defendants that Ms. Heron made disclosures to Treasury about significant problems in the program that jeopardized the program. There's also evidence contrary to the district court's finding of fact that these problems that she reported were significant and alarmed Fannie Mae's executives who were trying to suppress the problems. For example, the evidence shows that Ms. Heron reported in her memo, which she also reported to Treasury, that a half million or more of the million homeowners enlisted in these trial modifications would fail, which implicitly meant the program was a gross waste of funds. She also told them that contrary to what was required, and he said that if these trial modifications failed, it meant that the homeowners would not be able, many of them, to enroll in other modification programs and they would lose their home. Now, there's no evidence that anyone else from Fannie Mae advocated for Treasury to stop the trial modifications. In fact, Ms. Brown never advocated. She reported something that was said in the meeting. She didn't advocate as the appealing state. Mr. Edwards never talked to Treasury. He was the executive vice president of Fannie Mae. And the evidence, and there was a report that went over from Fannie Mae, but again, it was buried in a general report of the program. And no one except Ms. Heron forcibly argued to Treasury, you have to stop the trial modification program because it's leading to a gross waste of funds. There's also ample evidence that it was Fannie Mae and not Treasury that blocked Ms. Heron's move to Treasury. In fact, Eric Schupenhauer testified to that in the portion of the Brown-Mitchell report that he adopted in his deposition. There is also uncontradicted, we believe, uncontradicted testimony from the Treasury officials that they stopped looking at these ethics issues. They stopped considering her move to Treasury after Fannie Mae told them this would not proceed. First of all, there's emails, definitive emails between Eric Schupenhauer and Ms. Giardini saying, we do not want this transfer to go on. We do not want it to proceed. This was on December 21st, in the midst of what you all may remember was one of the worst snowstorms in Washington's history. And Ms. Giardini responded, got it. The next day, just to underline his point, Mr. Schupenhauer told Ms. Giardini, to be clear, I don't want it to go forward. Ms. Giardini then wrote an email saying, and I think this is interpreted as a cover story, she, quote, hoped to persuade Treasury that Ms. Heron's move was a bad idea for everyone, including Treasury, without appearing to kill the proposal. The evidence from Treasury officials, again, is uncontradicted that they stopped working on this problem. This is Lori Adams, the compliance officer for Treasury. They stopped working on the 10 questions once Fannie Mae said it wouldn't go forward. And Ms. Girtz from Treasury also said, it wasn't us who stopped the transfer or the positioning.  We wanted it to continue. And therefore, if one sets aside the erroneous factual findings that the court made, or the disputed issues of material fact that the court decided in the defendant's favor, you get to whether there's a close fit between her disclosures to Treasury, that is, that the trial modifications were not converting in significant amounts, and whether that would, in her mind, it was a waste of government funds, because it was a waste to put this money into trial modifications when these court closures would not be prevented. And both sections 5201 and 5213 of EISA satisfy or show the close fit. In 5201 of EISA, there's a statement that the purpose of this legislation is, in 2A, to protect home values. In 2B, to preserve home ownership and promote jobs and economic growth. C, to maximize overall returns to the taxpayers. 5213 of EISA, this is Joint Appendix 0370 and Joint Appendix 0131, it shows that the purpose of EISA is to protect the interests of taxpayers by maximizing overall returns and minimizing the impact on the national debt. And 3, the need to help families keep their homes. So the whole purpose of EISA, and going back to this period in our history in 2008, was to take enormous government funds to dig out the housing industry. And Fannie Mae was the agent of Treasury to do that through this foreclosure program. And the cost of that was that Congress wanted to make sure that if there was this enormous infusion of funds into entities such as Fannie Mae, that they were used effectively, they weren't wasted. But the public policy exception here, because she's an at-will employee, and so that public policy exception is always characterized as quite narrow. And so before we even get to the close fit, don't we have to decide whether EISA is the kind of statute that would even give rise to this exception? Yes, Your Honor, you do. And we think in this case the district court did find that there was a clear public policy. If you read, and I think this is the best way to do it, is look at the statute itself, and there are clear public policies that it was to save homeownership to the extent possible and to save taxpayers money because of the enormous infusion of funds. And that's true, that's a general public policy, but don't we have to have something in the statute or the regulation that really prohibits the conduct that the whistleblower is focusing on? Yes, but if you look at the close fit, which is, and I think it's easy, you're able to do that if you look at the memo she wrote, because the memo she wrote states what her disclosures were. And the memo she wrote states very clearly, these trial modifications will not convert. If they don't convert in the amounts that we're seeing now, the 50% or more, that means that there will be great waste of public funds. It means people will lose their homes because their credit is hurt, and 50% of these people will never convert. And then there's also, these are very expensive modifications, and if they fail, then they're going to waste public funds. So exactly the two policies set forth in the statute were things that she said were being violent. They weren't saving people's homes through the way Fannie Mae was implementing the program, and they weren't saving or using efficiently taxpayer money. So we think this is about as close to fit as you can get in terms of what she was doing. With respect to the tortious interference with contract claim, did Carolyn Herron have an expectancy? We also think the court made erroneous, decided disputed issues of material fact. The weight of the evidence is that she had an expectancy in continued contract employment with Treasury. Treasury wanted her, the job was there, they were pushing together. Secondly, the weight of the evidence is that others in Fannie Mae wanted her to work for them. That's Mr. McGee, who had a job for her that Fannie Mae lawyers said, well, there's a situation with Carolyn, you can't take her. Fannie Mae and the judge accepted that there was a contract review for a contract every four-month, six-month basis, and that that review was going to come up in March. When Fannie Mae's 30B6 representative testified, and this is undisputed, the contractors were extended on a routine basis for years. Some nearly served three years on a contract. And so just because the contract was coming up for review, as long as there were work to do, people were routinely extended. Same thing with the issue of the... Ms. Brown testified to the same thing, that contracts were automatically reviewed as long as there were work to do and the contract was fine. In terms of the other perspective expectancies, there was Rich McGee, who had a job for Ms. Heron that he was told he couldn't give her, and, as I said, Treasury wanted her as well. I'd like to address, in short order, the state actor versus private actor. The district court erred when it looked at the question, and this is what... that FHFA did not have permanent control over Fannie Mae. It said on Joint Appendix 195, Footnote 6, the critical issue is whether the government, through FHFA, permanently controls Fannie Mae. The court concludes that it does not. In reaching this, the court looked at the wrong issue. The proper issue is whether the federal government controls Fannie Mae, not FHFA, and that's what the Supreme Court set out in both LeBron and in the Department of Transportation case. They set out a list of factors that needs to be looked at, and, as this court knows from dealing with the Perry Capital case, the government is going to determine Fannie Mae's future, not FHFA. That's stated in a number of points in the joint stipulation. It's clear at this point, and it's stated in multiple government documents, that Fannie Mae is not going to be allowed to be recapitalized, so it cannot... There's a sweep of its profits, and it is not going to be allowed to become private ever again. Treasury directed Fannie Mae to reduce its portfolio. The government decides the compensation of the CEO. The government decides Fannie Mae is completely dependent on financial support through the guarantees of its loans. Has any other case, any other court, held that Fannie Mae is a government actor for these purposes? Not on constitutional claims, but I do believe that if you look at then-Judge Gorsuch's decision in the Ackerman case, that speaks to the situation here. That was the case, if the court recalls, in the Tenth Circuit, where the court ruled that the Center for Missing and Exploited Children was transformed into a government entity with constitutional responsibilities. That's what we think we have here, that it was a formerly private entity that transformed into a government entity. And it's sort of the history of Fannie Mae. It was originally federally charted as a government entity in 1938. It changed to a private entity by 1968, when the government decided it wanted it to be private for various policy reasons. And after the conservatorship, it transformed back into a government entity. We also look that if the court decides the issue is permanency, you look at permanency. You have to look at permanency as of the time that the decision is being made. The district court made the decision in 2012. There was ample evidence, in fact, overwhelming evidence, that the federal government had total control over Fannie Mae. Now it's even more clear, with the sweep of its profits, its direction to eliminate its portfolio. There's a third possibility. The court, and as Judge Capito pointed out, there hasn't been a court that has decided this particular issue. There's a third possibility, and that's set forth in the case of Alley v. Resolution Trust, where it was by one Judge Ginsberg who was on this court. The court said that Fannie Mae, or any entity, can be public for some reasons and private for other reasons. In this case, you have the rather unique situation that Fannie Mae, when Carolyn Heron was working for Fannie Mae, was running a government program. It was a very unique situation that it was essentially the alter ego of Treasury in running a federal program, making homes affordable. In running that program, it took certain actions and fired Ms. Heron. It was not. In fact, its duties in a private capacity with its private portfolio was totally separate from what it was doing under this program. Thank you. Thank you. Thank you, Your Honors. May it please the Court, I'm Michael Johnson, representing the Federal Housing Finance Agency. I'm here to address only one issue, the government actor issue. The Court should affirm the dismissal of Bivens' claim because Fannie Mae is not and was not a government actor for purposes of constitutional claims. I want to make two basic points. First, my friend, Ms. Burnaby, is asking this Court to split. It's asking this Court to split with not one other circuit, but with three. The Fourth, Sixth, and Ninth Circuits have all held, applying the law Ms. Burnaby cites, the LeBron case, that Fannie Mae, or the very similarly situated Freddie Mac, is not a government actor for constitutional purposes. No court, no federal court, has held Bivens. And Ms. Herron, the second point I want to make is that Ms. Herron mixes and matches two different strands of government actor law. There's a legal structure analysis under LeBron where a court will analyze whether a particular entity is part of the government for all purposes. That is, in everything it does, it can be deemed part of the government. That's LeBron. Separately, we have the Brentwood type analysis. It's a fair attribution analysis. Can the complaint of act here, the termination of Ms. Herron, be fairly attributed to the federal government? In this case, Ms. Herron's arguments fail on both. Under LeBron, as reiterated in the DOT, or the American Railroad Association case, the issue is whether the government has permanent control, as a matter of law. The Supreme Court looked at the statute that established Amtrak. It said, yes, government created the corporation. Check. Yes, government controls its operation because it has the ability to appoint a controlling majority of the board of directors. Yes. Is that control permanent? For Amtrak, yes. But when we look at LeBron and see how it analyzed that permanence issue, we see that whatever control the government has over Fannie Mae now is not permanent. LeBron includes two examples. First, it says where the government acquires ownership of a corporation's stock. That is temporary, not permanent. And that's because it's not as a matter of law. Yes, it's control, but it's not legal, structural control. And here, what we've got is a conservatorship. Conservatorship, as all courts have held so far, look at the question, inherently temporary. So the control is not permanent. Nor is the control a conservator or, most similar, probably even more controlling federal entity as a receiver, nor is that considered governmental control because conservators and receivers step into the private shoes of the entity in conservatorship or receivership. And we can see that not only in the Fourth, Sixth, and Ninth Circuit cases addressing Fannie Mae and Freddie Mac, but in the Fifth Circuit case addressing an RTC receivership in the Besborn case. In that case, the receiver extracted a civil judgment that included punitive damages. And then the government brought criminal charges against the same people for the same conduct. And those defendants said, hey, wait a minute. Wait a minute. I've already been punished by the government. The Double Jeopardy Clause precludes these criminal charges. And the Fifth Circuit said, no. Receiver, not the government. Now, why is that so important here? My friend, Ms. Burnaby, says, well, the government may have indefinite control over Fannie Mae. We don't know when the conservatorship is going to end or how it's going to end. And I agree with that. But that's not dispositive because, in the case of a receivership like the Besborn case, we know exactly how a receivership is going to end. The government will control the receivership until it's gone. The entire rest of the life of that entity is under the control of the federal receivership. And that is not enough to convert it into a federal actor. So even if we knew that the conservatorship would last 10 years, 20 years, 50 years, it's no different from receiverships, which, by the way, on average, last about nine years. So this is not something far outside of the mainstream. That's not enough to make it a government actor. Ms. Burnaby looks at the Brentwood line of cases. What's the problem with that analysis? The problem is what she wants to attribute to the government. The acts she wants to attribute to the government can't be fairly attributed to Treasury, which is her argument, because they were adverse to Treasury's interests. Look at what she said to the court in her argument. Treasury wanted Heron. Treasury wanted Heron. And she alleges Fannie Mae thwarted it. And that's throughout her brief, Your Honors, throughout her brief. Thwarted, pages 10 and 11. Impeded, page 12. Fannie Mae engaged in a charade, page 18. Deception against Treasury, page 16 and 19. Put obstacles in the way of Treasury's desires, page 19. Page 4 of her reply brief, Fannie Mae misled Treasury. You can't fairly attribute to Treasury acts that are undermining rather than advancing Treasury's policy. And we know that from the Brentwood case itself, because when it's discussing the Polk County decision, it says, State action doctrine does not convert opponents into virtual agents. And that's a case where a public defender, although being paid by the government, was not deemed a government actor because it was actively opposing the government in the case. That's Ms. Heron's allegation here. That Fannie Mae was interfering and impeding Treasury's attempts to advance its policies. And that simply cannot be fairly imputed to Treasury. The court should affirm the dismissal of Bivens' claim because Fannie Mae is not a government actor under Ito LeBron or Brentwood. I'd be happy to answer questions. Otherwise, I'll yield the balance of my time to Mr. Kasdan. Thank you. Good morning, Your Honors. Ira Kasdan on behalf of Appellee Fannie Mae and the individual appellees. I'll begin with the wrongful termination argument that Ms. Burnaby addressed first. And, Judge Brown, you're absolutely right. You don't have to get to the close fit issue at this stage in this case at all. It's the one place that we believe that Judge Collier made a mistake, and that is in finding that there was a public policy exception to the at-will doctrine here. And that is because, as Judge Brown, you mentioned, any public policy has to be a narrow one. And the Court of Appeals in D.C. has made it perfectly clear that such public policy has to be officially established in the statute, it has to be clearly reflected, it has to be firmly anchored in the statute. Again, as Judge Brown, as you made clear, usually on all these cases the common denominator is that there is prohibitory language in the statute. That's when the legislature is telling you that there's a public policy. Here, ESSA contains no prohibitory language. There's no allegation that Fannie Mae violated any prohibitions in ESSA. And as a consequence, ESSA is not a whistleblower statute. It says nothing about gross waste or gross mismanagement. Judge Collier only talked about goals in ESSA, but goals are insufficient. Again, it has to be something that is firmly established in the statute. It's not present over here. Your cellar court in D.C. Court of Appeals said that courts are to refrain from defining nebulous concepts of public policy and courts are not to evaluate actions where the public policy exception simply tends to be injurious to the public or against the public good. That's the best that can be said over here. As a consequence, Your Honors can affirm by simply saying that there is no public policy exception to begin with. But even if Your Honors were to look at the facts in this case, Judge Collier certainly was right on point in saying that there's no close fit between the alleged protected activities and the alleged public policy in this case. The only written document upon which Ms. Burnaby relies with respect to her wrongful termination issue is an e-mail. An e-mail that was written by Ms. Herron in November of 2009 internally to Fannie Mae. There's nothing in the record that that e-mail went to Treasury. There's no CC on it to Treasury. In fact, Ms. Herron herself contradicted herself in testimony. When she was asked whether or not this ever went to Treasury, she said, well, I thought so, but I see that there's no CC. Later on she decided, oh, yes, I remember I sent it. But the fact of the matter is that Ms. Caldwell and Ms. Gerst and everybody else at Treasury never received it, and that's what they testified to. There's nothing in the record whatsoever that would corroborate these claims of wrongful mismanagement and waste of public policy, of public funds. Again, as Judge Santella, I believe, you were saying, there are no disclosures over here. There has to be a disclosure. If there's no disclosure, then there's no close fit. And there's no reason that this Court can find that there was any disclosure because it's clear from the record that Ms. Brown, who is Ms. Herron's superior, back in June of 2009, told Treasury about the problems with stated trial modifications as found in the joint appendix at 721. The New York Times reported the problem, and if the New York Times knew about the problem, and certainly everybody else knew about it, that's in the record at joint appendix 869. And if you look at Ms. Herron's email, again, it says nothing about mismanagement or waste of public funds. There's nothing that was disclosed there. And indeed, Ms. Brown, her superior, responded immediately to that email, and here's what she wrote. This is in the appendix at 723. This is great. The good news here is nothing new to report. So based on the floor, based on the facts, there's no wrongful termination case here at all. With respect to tortious interference, again, she has no case. And the reason for that is the McManus case in the D.C. Court of Appeals, which she doesn't even address. Ms. Burnaby does not address in her papers to this Court, and as Judge Conley found, was conceded below. It's indisputable that Ms. Herron was an at-will contractor, and as a consequence, under the McManus case, she has no claim for tortious interference to remain a feigning at-will contractor, even though she wanted to be physically located or embedded at Treasury. The Court of Appeals was expressed in McManus, it says, this Court never has held that an employee can maintain a suit for interference with prospective advantages where expectancy was based on an at-will relationship and we do not do so now. That ends the case with respect to tortious interference. With regards to tortious interference, with her desire to get a non-HAMP job within Fannie Mae, again, she would still remain an at-will contractor at Fannie Mae, and as a consequence, under McManus, there is no valid business expectancy. And, in fact, the record is very clear. She didn't even get an interview. There was no assurances whatsoever, let alone any job offer. So, again, she has no claim. With respect to her interference claim within the mortgage finance industry, again, the indisputable fact is that there was no job offer, there were no assurances whatsoever. The only instance that she talked about was with respect to the Collingwood Group. Mr. Rude, who is the owner of Collingwood, was very explicit in his testimony in saying there was no job offer, there was no expectancy there whatsoever. I would just add one last point, and that's with regard to the Bivens issue. We joined with FHFA in urging this Court to find, as Judge Collingwood did, that Fannie Mae is not a governmental actor. But if, even assuming argumento, that that were to be the case, still there is no Bivens claim that would lie, and that is because Ms. Herring had alternative state remedies, which she availed herself to, and those are the tortious interference claims and the wrongful termination claims that she made. Of course, if the Court has any questions, I'd be happy to address them. Thank you. Thank you very much. Ms. Burnaby, you didn't have any time remaining. We'll give you one moment of rebuttal time. I'd like to address Fannie Mae's claim that there were no disclosures. If the panel looks at the Brown Witch Report, it would be clear there were disclosures to Treasury, and the individual defendants acknowledged that. Whether they were important or not, that is a disputed issue of material fact. Fannie Mae was the administrator for the program, and as the administrator told Treasury what was important and what was not. It was essentially the alter ego of Treasury for this program. It was called a fiduciary under its contract. As to the last point of intentional interference with adverse contractual relations, this is not an intentional interference with contract claim, which we believe the Court mistook it for. It's an intentional interference with advantageous perspective business relations, advantageous contractual relations. That's in the future. That is available to persons even in an at-will position who have the same possibility of future employment, which Ms. Herron had both with Treasury and with Mr. McGee. Thank you. Thank you. The case will be submitted.
judges: Brown, Kavanaugh, Sentelle